EL PUEBLO DE PUERTO RICO, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. JOAQUÍN CORREA SUÁREZ, JUEZ, demandado.

*Número*: 2869    *Resuelto*: 17 de enero de 1962

*J. B. Fernández Badillo, Procurador General, Nilita Vientós Gastón, Procuradora General Auxiliar,* abogados del peticionario; *S. L. Lagarde Garcés,* abogado del acusado.

Sala integrada por el Juez Presidente Señor Negrón Fernández como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El delito de conducir un vehículo de motor en estado de embriaguez se incorporó específicamente a nuestro derecho penal mediante la adopción del artículo 13 de la Ley Núm. 279 de 5 de abril de 1946 (Leyes, págs. 599, 637),(1) 9 L.P.R.A. sec. 183. En 1 de abril de 1953 el Gobernador de Puerto Rico dirigió un mensaje a la Asamblea Legislativa expresando su "gran desasosiego por las proporciones alarmantes que ha asumido el creciente número de accidentes automovilísticos que vienen ocurriendo en las carreteras", y expresó que "el gobierno puede prevenir una parte de tales accidentes haciendo más severas las leyes que penalizan la conducción negligente". Entre otras normas generales, propuso que toda persona que incurra en el delito de conducir un vehículo de

---

(1) Este artículo se enmendó mediante la Ley Núm. 156 de 26 de abril de 1951 (Leyes, pág. 369) al único efecto de aumentar de veinticinco a cien dólares la multa mínima en caso de convicción.

Entre las disposiciones para reglamentar la expedición de licencias a vehículos de motor y a sus conductores y chóferes, la Ley Núm. 55 de 27 de abril de 1942 (Leyes, pág. 527) contenía el inciso (k) del artículo 4 que preceptuaba que "ninguna persona podrá manejar un vehículo de motor mientras estuviere en estado de embriaguez". La Ley Núm. 75 de 13 de abril de 1916 (Leyes, pág. 144) no contenía ninguna referencia expresa a conducir vehículos estando ebrio. Véase, *Pueblo v. De Jesús,* 18 D.P.R. 960 (1912).

394

motor en estado de embriaguez sea condenada a cárcel, sin alternativa de multa".(²)    Estas sugestiones ejecutivas fueron consideradas detenidamente, y se concluyó que "lo procedente antes de aprobar dicha legislación era hacer los estudios y las investigaciones necesarias para establecer en nuestra legislación procedimientos científicos mediante los cuales se pudiera determinar el estado de embriaguez de los delincuentes de modo que las cortes pudieran disponer de todos *los medios de evidencia* adicionales que pudieran garantizar los derechos del ciudadano inocente, y a la sociedad y al estado proveérseles *los medios que condujeran a la convicción* de los culpables".(³) (Bastardillas nuestras.)    Como resultado del estudio legislativo, y para el propósito anunciado de reconciliar el interés de la comunidad y garantizar los derechos del ciudadano contra posibles excesos en la aplicación de la ley, se aprobó la Ley Núm. 95 de 29 de junio de 1954 (Leyes, pág. 993), cuya principal innovación consistió en introducir el sistema de exámenes químicos para determinar el grado de intoxicación alcohó'ica de los conductores.(⁴).    Se proveyó el procedimiento

(²) Diario de Sesiones, 1953, vol. II, tomo 3, pág. 1718.

(³) Informe de la Comisión Especial sobre Tránsito sobre el P. de la C. 1250, que luego se convirtió en la Ley Núm. 95 de 29 de junio de 1954. Diario de Sesiones, 1954, vol. IV, tomo 3, pág. 1486.

(⁴) En relación con la constitucionalidad de estatutos que autorizan análisis químicos para determinar el grado de intoxicación alcohólica, véanse, sobre autoincriminación: *Breithaupt* v. *Abram*, 352 U.S. 432 (1957); *Blackford* v. *United States*, 247 F.2d 745 (CA 9, 1957); *United States* v. *Nesmith*, 121 F. Supp. 758 (DC DC, 1954); *People* v. *Conterno*, 339 P.2d 968 (Cal. 1959); *State* v. *Smith*, 91 A.2d 188 (Del. 1952); *State* v. *Titak*, 144 N.E.2d 255 (Ohio, 1955); *Marshall* v. *State*, 262 S.W.2d 491 (Tex. 1953); sobre debido procedimiento de ley: *State* v. *Berg*, 259 P.2d 261 (Ariz. 1953); *People* v. *Duroneelay*, 312 P.2d 690 (Cal. 1957); *People* v. *Kiss*, 269 P.2d 924 (Cal. 1954); sobre registros ilegales: *Lebel* v. *Swincicki*, 93 N.W.2d 281 (Mich. 1958); *State* v. *Kroening*, 79 N.W.2d 810 (Wis. 1956).    En general, véanse, Anotaciones, *Requiring submission to physical examination or test as violation of constitutional rights*, 25 A.L.R.2d 1407 (1952) y 164 A.L.R. 967 (1946); *Chemical Tests for Intoxication*, Crim. L. Rev. 1961, págs. 5 y 73; *Admissibility of Compulsory Blood Alcohol Tests*, 6 Hast, L. J. 212, 214–217 (1955); *Constitutionality of Compulsory Chemical Tests to Determine Intoxication*, 49 J. Crim. Law, Crim. & P. S. 58 (1958);

para la toma de las muestras y se determinó respecto al efecto probatorio del resultado de los exámenes. [5]

La sección 5-801 de la Ley de Vehículos y Tránsito de 1960, 9 L.P.R.A. sec. 1041(a), que sigue sustancialmente [6] la redacción de la sección 11-902 del Código Uniforme de Vehículos de Motor, [7] dispone que:

"(a) Será ilegal que cualquier persona bajo los efectos de bebidas embriagantes conduzca o haga funcionar cualquier vehículo de motor. Toda infracción a esta disposición se ventilará ante la sala correspondiente del Tribunal Superior, por tribunal de derecho.

"(b) En cualquier proceso criminal por infracción al párrafo (a) que precede, relacionado con el manejo de un vehículo de motor bajo los efectos de bebidas embriagantes, la cantidad de alcohol existente en la sangre del acusado al tiempo en que se cometiere la alegada infracción según surja tal cantidad del análisis químico de su sangre, orina o aliento, *constituirá base para las siguientes presunciones*:

(1) Si al momento del análisis había en la sangre del acusado cinco (5) centésimas de uno (1) por ciento, o menos, por peso

---

*The Compulsory Use of Chemical Tests for Alcoholic Intoxication; a Symposium*, 14 Md. L. Rev. 111 (1954); Wis. L. Rev., 1958, págs. 203–209.

[5] La ley, en la parte pertinente, disponía que: "A los fines de esta sección (a) constituirá evidencia prima facie de que el acusado no estaba intoxicado o bajo los efectos de bebidas embriagantes, prueba al efecto de que al momento del análisis había en la sangre del acusado 5/100 avas partes de un por ciento, o menos, por peso de alcohol; (b) constituirá prueba relevante pero no será evidencia prima facie, sobre si el acusado estaba o no intoxicado o bajo los efectos de bebidas embriagantes, el hecho de que en la sangre del acusado se halló al momento del análisis más de 5/100 avas partes de un por ciento pero menos de 15/100 avas partes de un por ciento, por peso, de alcohol; y (c) se admitirá como evidencia prima facie de que el acusado estaba intoxicado o bajo los efectos de bebidas embriagantes, el hecho de que al momento del análisis había en su sangre 15/100 avas partes de un por ciento, o más, por peso, de alcohol."

[6] La única diferencia importante consiste en que el Código Uniforme admite en todos los casos la presentación de cualquier otra evidencia competente para establecer que el acusado se encontraba o no bajo los efectos de bebidas embriagantes al tiempo de la alegada infracción, mientras que la ley local sólo permite la presentación de dicha evidencia cuando el resultado del análisis arrojare más de cinco centésimas de uno por ciento, por peso de alcohol.

[7] National Safety Council, Uniform Vehicle Code, Act V (1952).

de alcohol, se presumirá que el acusado no estaba bajo los efectos de bebidas embriagantes al tiempo de cometer la alegada infracción.

(2) Si al momento del análisis se hallare en la sangre del acusado más de cinco (5) centésimas de uno por ciento, pero menos de quince (15) centésimas de uno (1) por ciento, por peso de alcohol, tal prueba no constituirá base para presumir que el acusado estaba o no bajo los efectos de bebidas embriagantes, pero dicha prueba podrá ser considerada conjuntamente con otra evidencia competente para determinar la culpabilidad o inocencia del acusado.

(3) Si al momento del análisis había en la sangre del acusado quince (15) centésimas de uno (1) por ciento, o más, por peso de alcohol, se presumirá que el acusado estaba bajo los efectos de bebidas embriagantes al tiempo de cometerse la alegada infracción.

(4) Las disposiciones de los párrafos (2) y (3) del inciso (b) que precede, no deberán interpretarse en el sentido de que las mismas limitan la presentación de cualquier otra evidencia competente sobre si el acusado estaba o no bajo los efectos de bebidas embriagantes al tiempo de cometerse la alegada infracción." (Bastardillas nuestras.) ▪

En el presente recurso consideramos el tercer planteamiento presentado durante los últimos meses en relación con la procedencia de o la suficiencia de una acusación formulada bajo esta sección. En *Acevedo* v. *Tribunal Superior*, sentencia de 18 de octubre de 1961, resolvimos que en el caso de un conductor que se niega a dejarse tomar una muestra para el examen químico, la desviación del procedimiento señalado en la sección 5-804, 9 L.P.R.A. sec. 1044, no impide el proceso criminal. En 20 de diciembre pasado, sostuvimos en *Pueblo* v. *Vargas Ramírez*, 84 D.P.R. 225 (1961) que no es indispensable alegar que el acusado conducía un vehículo de motor en estado de embriaguez *en una vía pública*. Nos corresponde determinar ahora si en una acusación por infracción a la sección 5-801 (a) antes transcrita es impres-

cindible alegar que el resultado del análisis químico excedió de cinco centécimas de un por ciento, por peso de alcohol.

Esta sección relativa al valor probatorio de los análisis químicos ha sido incorporada por todos los estados de la Unión y el Distrito de Columbia. [8]  A pesar de que existen diferencias entre los individuos en cuanto se refiere a la forma de absorción y eliminación de alcohol, la investigación científica y la experiencia han demostrado que el análisis del contenido de alcohol en la sangre constituye un medio adecuado y confiable para medir los efectos de las bebidas embriagantes en una persona. [9]  Este método ha recibido la aprobación de la Asociación Médica Americana, el Consejo Nacional de Seguridad, la Asociación Americana de Abogados y la Conferencia de Tránsito del Presidente. [10]  El propósito principal de estas disposiciones es establecer normas fijas [11] para la determinación de si el acusado estaba bajo la influencia de bebidas alcohólicas, y eliminar la necesidad de presentar testimonio pericial.  46 J. Crim., Crim. L. & P. S. 72, 75 (1955).  Es pues un caso en que la evidencia objetiva sustituye la de opinión.  En unos comentarios que aparecen en el volumen 6 del Hastings Law Journal, pág. 213, se dice:  "Esta disposición provee un juicio más eficiente . . .

---

[8] Boyd, *An Analysis of the Drunken Driving Statutes in the United States*, 8 Vand. L. Rev. 888 (1955).

[9] *A Study of Chemical Tests for Alcoholic Intoxication*, 17 Md. L. Rev. 193 (1957).

[10] Brooks, *Chemical Tests for "Driving Under the Influence"*, 37 Mass. L. Q., Dic. 1952, págs. 10, 13.

[11] Los últimos estudios en relación con la cantidad de alcohol en la sangre del detenido al tiempo de la comisión de la alegada infracción y las presunciones que de ello se derivan recomiendan se amplíen las líneas de demarcación en la siguiente forma: .00% a .05%, la persona no está bajo los efectos de bebidas embriagantes; .05% a .10%, posiblemente bajo la influencia de bebidas alcohólicas; .10% a .15%, probablemente bajo tal influencia; y, sobre .15%, definitivamente bajo los efectos de bebidas. Esta modificación a las presunciones responde a la consideración del factor de tolerancia de algunos individuos. National Safety Council, *Evaluating Chemical Tests for Intoxication*, pág. 12.

El jurado no necesita considerar evidencia de opinión; los legisladores le han facilitado el camino. Cuando el químico del laboratorio declara sobre el contenido alcohólico de la sangre, se establece automáticamente el grado de intoxicación y corresponde al acusado la carga de la prueba para demostrar que no se encontraba bajo la influencia de bebidas embriagantes." [12] ■

---

[12] La investigación preliminar en estos casos generalmente debe cubrir una serie de circunstancias tendentes a revelar que la conducta del acusado obedecía a la influencia de bebidas intoxicantes. En el estado de Wisconsin se sigue el procedimiento que se describe en la Revista Jurídica de Wisconsin, año 1958, págs. 200 y 201:

*"Pruebas Físicas y Químicas para Determinar Embriaguez*

"En Wisconsin prácticamente todas las agencias encargadas de hacer cumplir la ley han adoptado y puesto en práctica las pruebas convencionales a aplicarse a sospechosos de conducir vehículos en estado de embriaguez. Este procedimiento se divide generalmente en tres etapas: la primera se dirige a obtener información que identifique al acusado y varias preguntas que tienen por miras ayudar al Pueblo a enfrentarse a determinadas defensas el día del juicio. Se le pregunta al acusado si ha estado ingiriendo bebidas embriagantes, la clase, la cantidad, la hora en que empezó y cuándo terminó de ingerirlas, y el sitio en que lo hizo. Luego se le pregunta si está enfermo, bajo tratamiento médico, el nombre del doctor, si está tomando medicinas, qué clase de medicina, y la hora exacta en que tomó la última dosis. El propósito de esta serie de preguntas es anticiparse a la posible defensa el día del juicio de que el acusado no estaba embriagado y sí enfermo, en aquellos casos en que los síntomas de la enfermedad puedan ser idénticos a la conducta de una persona bajo los efectos de bebidas embriagantes. Entonces se le pregunta al acusado si es diabético, si toma insulina, si ha usado un desinfectante bucal, la fecha en que vio al dentista por última vez y cuánto tiempo había dormido inmediatamente antes de su arresto. El propósito de estas preguntas es el mismo que el anterior, toda vez que los síntomas de una persona en trance diabético o por la administración de insulina son casi idénticos a los de una persona en estado de embriaguez, aun hasta el supuesto olor a alcohol en el aliento del individuo como resultado de la formación de quetonas y acetonas. Las preguntas en cuanto al sueño van dirigidas a rebatir la posible defensa de que el policía confundió el cansancio con la embriaguez.

"Luego se le pregunta al acusado si está lesionado, si recibió un golpe en la cabeza, y si había tomado algo después de ocurrido el accidente (de haber ocurrido uno). La primera de estas dos preguntas es para contrarrestar la defensa de que la conducta del acusado se debía a las lesiones recibidas, y la segunda para hacer frente a la defensa de que el acusado se embriagó después de haber estado conduciendo el vehículo.

El interventor descansa en el hecho de que el historial legislativo([13]) indica que cuando el resultado del análisis químico es menor de cinco centésimas de uno por ciento, por peso de alcohol, "crea la presunción de que el acusado no estaba bajo los efectos de bebidas embriagantes, y si expresamente la ley prohibe el que se pueda producir ninguna otra evidencia para controvertir esta presunción, es porque resulta ser no delictivo el llevar en el cuerpo hasta esa cantidad de alcohol conduciendo automóviles". De ello deriva la conclusión de que es indispensable alegar en la acusación que el resultado del análisis fue mayor de cinco centésimas del uno por ciento, y que la ausencia de tal alegación hace fatalmente defectuosa la acusación. ▮

No podemos convenir en esta posición. En primer lugar, hemos expuesto anteriormente los propósitos que informan estas disposiciones sobre los resultados de los análisis, que no son más que medios probatorios que se facilitan para la administración eficiente de la ley en su fase de persecución del delito. De ahí que la propia ley indique que el resultado del análisis "constituirá base para las siguientes *presunciones*". En segundo lugar, si tal alegación fuera indispensable para que la acusación por el delito fuera suficiente, nos encontraríamos con que en los casos en que el conductor no permite que se le tome la muestra, no podría exponerse que el resultado del análisis excedió del por ciento indicado. El delito de conducir en estado de embriaguez es uno. No po-

---

"La segunda etapa de las pruebas convencionales sobre los efectos del alcohol consiste de lo que observó el policía que practicó el arresto, incluyendo el aliento del acusado, el estado de sus ojos, el color de su tez, la condición de sus ropas, la actitud, y cualesquiera otros rasgos poco comunes.

"La tercera etapa consiste de las pruebas físicas a que es sometido el acusado en presencia del policía que lo arresta. Estas pruebas incluyen la reacción de sus ojos a la luz, cómo camina, su control del balance, habilidad para cambiar de dirección, la prueba del dedo y la nariz, recoger e identificar monedas, cómo habla, la pronunciación, conocimiento de sitio y lugar, y la caligrafía del acusado."

([13]) Diario de Sesiones, 1960, págs. 2223 a 2225.

demos resolver que en unos casos la acusación requiera la alegación de unos ingredientes y en otros casos pueda dispensarse de la alegación de uno de esos elementos. Se deduce claramente que se trata de una defensa disponible para el acusado, cf. *Pueblo* v. *Vargas Ramírez*, supra; *Pueblo* v. *Hiraldo*, 54 D.P.R. 639, 643 (1939); *Pueblo* v. *Avilés*, 54 D.P.R. 272 (1939); *Pueblo* v. *Giraud*, 52 D.P.R. 31 (1937), o sea, que si el resultado fuere menor de las cinco centésimas, podrá plantearse este hecho por vía de defensa[14] y que se presumirá concluyentemente—en vista de que el inciso (b) (4) de la sección 5-801 impide la presentación de cualquier otra evidencia competente—que el acusado no estaba bajo los efectos de bebidas embriagantes al tiempo de cometer la alegada infracción. ■

Finalmente, en *Pueblo* v. *Cabrera Osorio*, 84 D.P.R. 97 (1961) resolvimos implícitamente una cuestión que tiene relevancia en lo que se plantea por el interventor. Rechazamos la alegación que se hizo por un acusado convicto de conducir bajo los efectos de bebidas embriagantes dirigida a impugnar el procedimiento observado en la toma de la muestra de orina y su subsiguiente análisis, porque, "habiendo quedado establecido por el testimonio de la policía que el acusado conducía un vehículo en estado de embriaguez nada añadía la prueba sobre el análisis químico de la orina que se le hizo (citas)." En otras palabras, el fiscal puede establecer el delito sin necesidad de presentar prueba sobre el resultado del examen, y correspondería entonces al acusado ofrecer el informe del análisis si éste le favorece por arrojar un por ciento inferior a las cinco centésimas del uno a que hemos venido haciendo referencia.

---

[14] La sección 11 del Reglamento sobre Toma de Muestras de Sangre y Orina, 9 R. & R.P.R. sec. 183-11, garantiza al acusado un conocimiento con anterioridad al juicio del resultado del análisis, ya que dispone que se le remitirá copia del informe del resultado "al sujeto de quien la muestra fue tomada, a su dirección postal".

*Se anulará la resolución recurrida dictada por el Tribunal Superior, Sala de San Juan, en 31 de mayo de 1961 y se devolverá el caso para procedimientos ulteriores consistentes con esta opinión.*