EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* DIEGO E. ZALDUONDO FONTÁNEZ, acusado y apelante.

*Número:* CR-63-15 *Resuelto:* 30 de septiembre de 1963

*Mario Báez García,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Américo Serra, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

En *Pueblo* v. *Monroig Rodríguez*, 87 D.P.R. 655 (1963), dijimos que cuando el resultado del análisis de la muestra que se le toma a una persona acusada de conducir un vehículo de motor bajo la influencia de bebidas embriagantes arroja la presencia en la sangre de quince centésimas de uno por ciento, o más, por peso de alcohol, corresponde a ésta desvirtuar el efecto de la presunción a que se refiere el inciso (b) (3) de la Sec. 5-801 de la Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 141 de 20 de julio de 1960, 9 L.P.R.A. sec. 1041, y, que, si falla en el intento, la prueba sobre el resultado indicado del análisis es suficiente para sostener la convicción. En el mismo sentido, *Pueblo* v. *Díaz Nieves*, Per Curiam resuelto el 30 de septiembre de 1963; *Pueblo* v. *Riego Zuñiga*, 87 D.P.R. 584 (1963). De ahí la importancia que tiene en el presente caso el error que se le imputa al tribunal de instancia por negarse a ordenar el examen de comprobación de la tercera muestra al surgir una discrepancia entre el análisis oficial—que arrojó un resultado de 20/100, por peso de alcohol—y el análisis hecho privadamente por instrucciones del acusado, cuyo resultado fue de 14/100, por peso de alcohol.

La prueba presentada por el fiscal sobre la conducta y condiciones en que se encontraba el apelante establece, sin lugar a dudas, la presencia de un hálito alcohólico, pero este hecho, por sí solo, no sería suficiente para sostener que se incurrió en el delito imputado. Es más, los testimonios de los testigos de cargo son de naturaleza esencialmente exculpatoria. El doctor José M. Díaz Pérez, quien tomó las muestras de orina, declaró que con excepción del olor a licor que despedía el acusado—que calificó de regular—no presentaba ninguna otra señal de embriaguez, pues no observó que tuviese dilatación de las pupilas, hablaba coherentemente, tenía seguridad en los reflejos locomóviles, y no observó una conducta antisocial. José Espola, propietario de otro vehículo con el cual el del apelante tuvo una colisión, atestó que solamente

notó Zalduondo estaba un poco nervioso y majadero, "con la nerviosidad del choque", pero no percibió que oliera a licor. El ciclista de la División de Tránsito de la Policía Estatal, corroboró que el acusado estaba nervioso, aunque no alterado, despedía olor a licor y tenía los ojos rojizos. En relación con este último particular otro agente del orden público que se encontraba en el cuartel aseveró en parecidos términos que el acusado tenía los ojos rojizos, pero a preguntas del defensor dijo: "¿Cómo usted le encuentra la vista al acusado ahora, en estos momentos?—Yo lo he visto que está igual.—¿O sea rojiza también? —Exactamente. —¿De modo que en la forma que está ahora la vista usted la vio aquel día en el cuartel? —Más o menos igual."

Estos hechos quedan mejor enmarcados en las circunstancias de excepción que consideramos en *Pueblo* v. *Galleti Rodríguez*, 88 D.P.R. 284 (1963). No puede aplicársele la doctrina que sobre el particular resumimos en *Pueblo* v. *Vélez Ruíz*, 89 D.P.R. 53 (1963); y sus antecesores *Pueblo* v. *López Rodríguez*, 88 D.P.R. 474 (1963); *Pueblo* v. *De Jesús Marrero*, 88 D.P.R. 154 (1963); *Pueblo* v. *Gregory*, Per Curiam resuelto en 21 de marzo de 1963; *Pueblo* v. *Comas Sosa*, 87 D.P.R. 674 (1963); *Pueblo* v. *Soto Cintrón*, 87 D.P.R. 688 (1963); *Pueblo* v. *Reigo Zuñiga*, supra; *Pueblo* v. *Quiles Morgado*, 87 D.P.R. 491 (1963); y *Pueblo* v. *Ordein Sánchez*, 86 D.P.R. 484 (1962).

Puede afirmarse que la única prueba sobre la cual descansa la convicción del apelante es el resultado del análisis de la primera muestra. Precisa, por tanto, que examinemos los hechos relacionados con la petición del acusado para que se practicara el examen de comprobación. Las muestras de orina se tomaron el 22 de abril de 1962; el análisis de la primer muestra por el Departamento de Salud se verificó el día 2 de mayo; la acusación se presentó nueve días después, en 11 de mayo; en 29 de junio, el acusado presentó una moción señalando que la muestra que le fuera entregada había sido

examinada por un ingeniero químico—el informe tiene fecha de 24 de mayo—y que surgiendo discrepancia con el resultado del análisis oficial, solicitaba se ordenara el examen de comprobación de la tercera muestra, por lo cual solicitó la suspensión del juicio señalado para el 3 de julio y renunció su derecho a un juicio rápido. De la minuta de la vista celebrada en esta última fecha aparece que la moción fue discutida—no surge que se practicara prueba sobre el particular—y al calce de la moción el Juez señor Ramos Vázquez consignó su resolución en estos términos: "No ha lugar por ser tardía." La vista se transfirió para el 20 de julio. El acusado solicitó nuevamente que se analizara la tercera muestra, recayendo idéntica resolución. Se señaló el juicio para el 6 de agosto por ausencia de un testigo de cargo cuyo testimonio era esencial. En esta fecha se celebró finalmente la vista y en sus comienzos el abogado de la defensa informó al tribunal—entonces presidido por el Juez señor Archilla Guenard—que se oponía a que se presentara prueba sobre el resultado del análisis de la primera muestra por no haberse ordenado el examen de comprobación. El juez a quo indicó que no podía planteársele este asunto nuevamente ya que el mismo había sido resuelto adversamente al acusado por otro magistrado de igual categoría.

La Sec. 5-803 (f) de la Ley de Vehículos y Tránsito, 9 L.P.R.A. sec. 1043 (f), lee así:

"Toda muestra de sangre u orina será dividida en tres partes: Una será entregada a la persona detenida, para que la envíe a analizar a un químico de su selección, si así lo deseare, y las otras dos serán reservadas para el uso del Departamento de Salud, una de ellas con el propósito de ser usada en el análisis químico requerido por este artículo y la otra, se conservará para ser analizada únicamente por instrucciones del tribunal, en caso de que existiere discrepancia entre el análisis oficial y el análisis hecho privadamente por instrucciones del acusado."

La disposición reglamentaria correspondiente, Art. 7 del Reglamento Núm. 30 aprobado por el Secretario de Salud en 29

de septiembre de 1960, 9 R.&R.P.R. sec. 1043–7, en su parte pertinente, se limita a establecer que "El segundo frasco de cada muestra recibida se conservará bajo refrigeración según llegue y debidamente identificado, para ser analizado únicamente por instrucciones del Tribunal en caso de que existiere discrepancia entre el análisis oficial y el análisis hecho privadamente por instrucciones del acusado."

De las disposiciones transcritas no aparece que se haya fijado un término específico para solicitar el examen de comprobación.[1] Contrasta así con la reglamentación vigente en cuanto al examen de comprobación de las muestras de leche y otras materias alimenticias no averiables, en relación con las cuales el Art. 11 del Reglamento Núm. 12 del Secretario de Salud, aprobado en 9 de noviembre de 1944, según enmendado por el Reglamento Núm. 26 de 1 de abril de 1953, 24 R.&R.P.R. sec 730–11,[2] dice así:

"En los casos por adulteración de leche, el examen de comprobación se llevará a efecto, de solicitarlo la parte interesada, dentro del término de 10 días a partir de la fecha de la notificación al interesado de que la muestra tomádale resultó adulterada; Disponiéndose que, en casos meritorios y si se alegaren razones satisfactorias ante nos, podremos extender dicho término por 5 días más; pero nunca se permitirán exámenes para comprobación de muestras de leche luego de transcurridos 15 días a contar desde la indicada notificación o si las muestras de leche se encontraren en estado de acidez incipiente.

"El término para los exámenes de comprobación sobre materias alimenticias no averiables, será de 20 a partir de la notificación a la parte interesada de que la muestra tomádale resultó adulterada, pudiéndose extender dicho término por 10 días adicionales y en las mismas condiciones antes expresadas."

---

[1] El anterior Reglamento Núm. 27 del Secretario de Salud, aprobado en 15 de noviembre de 1954, relativo a toma de muestras de sangre y orina, tampoco fijaba término alguno.

[2] En cuanto a muestras de leche, véase también el Art. 116 del Reglamento Núm. 96 aprobado por la Junta Insular de Sanidad en 1 de junio de 1934, 24 R.&R.P.R. sec. 790–116. Cf. Sección XI del Reglamento Hípico aprobado el 23 de febrero de 1962, especialmente el Art. 1114.

 Atendido el efecto evidenciario de las presunciones que establece la ley en relación con el resultado de los análisis de las muestras, y ante la posibilidad de la existencia de error en los exámenes, fácil es comprender que el propósito legislativo al incorporar el examen de la tercera muestra fue garantizar al ciudadano la oportunidad de comprobar la corrección de los resultados cuando existe discrepancia entre los efectuados. Para ello debe establecerse la existencia de la discrepancia entre el análisis oficial y el hecho privadamente por instrucciones del acusado, conforme resolvimos en *Pueblo* v. *Cruz Rivera*, 88 D.P.R. 332 (1963). No se trata de una mera oportunidad adicional que se le brinda al acusado según indica el Procurador General al referirse a una frase de nuestra opinión en el citado caso de *Cruz Rivera*, especialmente si se considera que la solicitud de comprobación lleva consigo la renuncia a la impugnación de la legitimidad de las muestras y de la regularidad del procedimiento seguido para su toma, *Pueblo* v. *Díaz Nieves*, supra. Resolvemos, por tanto, que el tribunal viene obligado a ordenar el examen de comprobación cuando se solicita por el acusado una vez establecida la existencia de discrepancia.

 No hemos pasado por alto la posibilidad de que la tercera muestra que se conserva en el laboratorio del Departamento de Salud se dañe o esté inservible, bien por el tiempo transcurrido desde que se tomó o por cualquier otro factor que corresponde a los químicos explicar. Si así fuere este hecho puede probarse ante el tribunal y podría constituir una justificación razonable para que no se efectuara el examen de comprobación. (³) No debe olvidarse que la comisión del delito puede establecerse por prueba independiente del resultado de

---

(³) En adición a la literatura citada en *Pueblo* v. *Tribunal Superior*, supra, sobre los exámenes para determinar el grado de intoxicación alcohólica, véanse, Gerber, *Practical Use of Results of Biochemical Tests for Alcohol*, 47 A.B.A.J. 477 (1961) y Nota, *Chemical Tests for Intoxication: A Legal, Medical and Constitutional Survey*, 37 N.D.L. Rev. 212–260 (1961).

los análisis. *Pueblo* v. *Cruz Rivera*, supra; *Pueblo* v. *De Jesús Marrero*, supra; *Pueblo* v. *Soto Cintrón*, supra; *Pueblo* v. *Quiles Morgado*, supra; *Pueblo* v. *Tribunal Superior*, 84 D.P.R. 392 (1962); *Pueblo* v. *Cabrera Osorio*, 84 D.P.R. 97 (1961).

█ Si bien hemos reconocido el derecho del acusado a que se practique el examen de comprobación, la solicitud al efecto debe presentarse diligentemente y con suficiente anticipación a la fecha señalada para el juicio. Cf. *Pueblo* v. *Díaz*, 63 D.P.R. 987 (1944) y *Pueblo* v. *De Jesús*, 63 D.P.R. 735 (1944), en relación con mociones de archivo; Regla 234 de las de Procedimiento Criminal de 1963, sobre la moción de supresión de evidencia. Así se evita que se convierta en un escape para lograr la suspensión de la vista señalada. Correspondería al acusado exponer las circunstancias que le impidieron solicitarlo antes de la fecha del señalamiento, si ese fuere el caso.

█ En el presente caso el tribunal de instancia denegó la solicitud del acusado para el examen de comprobación formulada cuatro días antes del señalamiento. Indicó como fundamento que era tardía. Sin embargo, como el juicio fue pospuesto para el día 20 de julio,[4] y nuevamente para el 6 de agosto,[5] la falta de diligencia en que pudiera haber incurrido el acusado al tardar más de treinta días en pedir el examen de la tercera muestra se tornó académica.

█ Consideradas todas las circunstancias que aquí concurren, especialmente que la única prueba para sostener la convicción es el resultado del primer análisis ya que como apuntamos los testimonios de los testigos sobre la conducta y condiciones del acusado son de naturaleza exculpatoria, la

---

[4] No se indica a petición de cuál de las partes se decretó la suspensión. El apelante indica en su alegato que lo fue a instancias del fiscal, y así parece desprenderse de la minuta pues se dice en la misma que el tribunal ordenó la citación del testigo José Espola y del químico.

[5] La transferencia para esta fecha fue gestionada por el fiscal debido a la ausencia de uno de sus testigos principales.

negativa a ordenar el examen de la tercera muestra fue altamente perjudicial.

*Se revocará la sentencia dictada por el Tribunal Superior, Sala de Mayagüez, en 6 de agosto de 1962, y se absolverá al acusado.*