EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>    Peticionario<br><br><br>        v.<br><br><br>Héctor Caraballo Borrero<br><br>    Recurrido | Certiorari<br><br>2012 TSPR 171<br><br>187 DPR ____ |

Número del Caso: CC-2011-1064


Fecha: 8 de noviembre de 2012


Tribunal de Apelaciones:

        Región Judicial de Ponce


Oficina del Procurador General:

        Lcdo. Luis Román Negrón
        Procurador General

        Lcdo. Jeanette Collazo Ortiz
        Subprocuradora General

        Lcda. Daphne Cordero Guilloty
        Procuradora General Auxiliar


Abogada de la Parte Recurrida:

        Lcda. Glorimar Acevedo Acevedo


Materia: Ley de Tránsito – Embriaguez; Periodo de observación; Supresión de evidencia científica


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

        v.                      CC-2011-1064    Certiorari

Héctor Caraballo Borrero

    Recurrido

Opinión del Tribunal emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 8 de noviembre de 2012.

Nos corresponde determinar si un policía que realizó una prueba preliminar de aliento a un conductor que expelía y exhibía signos aparentes de embriaguez, en violación al periodo de observación reglamentario de 20 minutos, tenía motivos fundados para trasladar al individuo al cuartel y realizarle una prueba definitiva de aliento para detectar el nivel de alcohol en la sangre. Además, debemos resolver si la supresión de la prueba de campo acarrea automáticamente la exclusión de la prueba científica posterior. Por entender que el agente del orden público tenía motivos fundados para creer que el detenido

conducía un vehículo de motor bajo los efectos de bebidas embriagantes, y que la exclusión de la evidencia científica de campo no acarrea la supresión automática de la evidencia científica posterior, revocamos el dictamen recurrido.

I

Eran aproximadamente las 2:30 de la tarde del 20 de marzo de 2011. La patrulla policial aparcaba al margen de la Carretera Núm. 2, en dirección de Ponce a Yauco. En su interior, el Agte. Jesús Vélez Pabón tomaba la velocidad de los vehículos que por allí transitaban. Era una zona con límite de 55 millas por hora. A esa hora, el radar empleado por el agente marcó a un vehículo que discurría muy apresurado, a 85 millas por hora.

El policía hizo señas para que el conductor del automóvil se detuviera. Luego de avistar al agente, el chofer que circulaba por encima del límite suspendió la marcha. El policía se aproximó al auto y le solicitó al conductor del deportivo blanco y subcompacto Toyota la licencia de conducir y los documentos del vehículo.

Fue ahí cuando el Sr. Héctor Caraballo Borrero bajó la ventanilla de su automóvil y el agente Vélez Pabón percibió un fuerte olor a alcohol.[1] El policía inquirió respecto a la causa del hedor. El conductor del deportivo blanco tuvo dificultad en proferir palabras para darse a

---

[1] Consignación de hechos probados en vista de supresión de evidencia, Escrito en Cumplimiento de Orden de 23 de septiembre de 2011, Apéndice, pág. 16.

entender.[2] Pero consiguió enunciar una respuesta afirmativa. Con el habla pesada, voluntariamente aceptó haberse dado unos tragos.[3] Informó además que se dirigía a su trabajo. En el acto, el agente le impartió las advertencias de ley y le ordenó desmontarse. Sin oponer resistencia el señor Caraballo Borrero así lo hizo.

Eran las 2:35 de esa tarde cuando el agente Vélez Pabón le realizó al conductor la prueba de aliento con el instrumento Alco-Sensor. Habían transcurrido 5 minutos desde la intervención con el recurrido. El resultado de la aludida prueba fue positivo. El agente arrestó al chofer y le trasladó al cuartel. Allí se le realizó al arrestado una segunda prueba de aliento —en esta ocasión con el instrumento conocido como Intoxilyzer 5000— la cual arrojó un resultado de .175 centésimas del uno por ciento de alcohol en la sangre. A esa altura ya habían transcurrido 35 minutos desde la intervención inicial.[4] Durante ese tiempo el agente observó que el señor Caraballo Borrero no comiera, fumara o vomitara, circunstancias que bien podrían perturbar el resultado de la prueba.[5]

---

[2]Escrito en cumplimiento de orden de la parte recurrida ante el Tribunal de Apelaciones, de 10 de agosto de 2011, Apéndice, pág. 37.

[3]Íd.; Alegato de la parte recurrida, págs. 15-16, 18; Consignación de hechos probados en vista de supresión de evidencia, *supra*, Apéndice, pág. 16.

[4]Consignación de hechos probados en vista de supresión de evidencia, *supra*, Apéndice, pág. 16.

[5]Íd.

Por esos hechos se le expidió un boleto por exceso de velocidad al señor Caraballo Borrero y se presentó una denuncia contra él por manejar un vehículo de motor bajo los efectos de bebidas embriagantes, en violación al Art. 7.02(a) de la Ley de Vehículos y Tránsito de Puerto Rico.[6] Posteriormente, se determinó causa probable para procesar al señor Caraballo Borrero por el delito imputado, y las partes quedaron citadas para el juicio en su fondo, por tratarse de un delito menos grave.

Oportunamente, la defensa del señor Caraballo Borrero presentó una moción de supresión de evidencia. En ella argumentó que el agente Vélez Pabón administró la prueba de aliento con el instrumento Alco-Sensor a sólo 5 minutos de la intervención. Por ello, solicitó la supresión del resultado de dicha prueba por haberse incumplido el requisito de 20 minutos de observación previo a la aplicación de ésta, según lo dispuesto en el Reglamento Núm. 7318 de 28 de febrero de 2007 del Departamento de Salud, que regula la toma de pruebas científicas para determinar la concentración de alcohol y otras sustancias en la sangre.[7] Según la defensa del señor Caraballo Borrero, de esa prueba preliminar fue que el agente Vélez

---

[6]Ley Núm. 22-2000 (9 L.P.R.A. sec. 5202).

[7]El referido reglamento también es conocido como el Reglamento del Secretario de Salud Núm. 123. Fue creado para regular los métodos y procedimientos para la toma y análisis de muestras de sangre, orina o de cualquier otra sustancia del cuerpo. Además, se instituyó para adoptar y regular el uso de los instrumentos científicos para la determinación de concentración de alcohol, incluyendo la prueba inicial de aliento y la detección e identificación de drogas y/o sustancias controladas.

Pabón derivó los motivos fundados para arrestar al imputado, trasladarlo al cuartel y administrarle en ese recinto la prueba con el instrumento Intoxilyzer 5000, por lo que esta prueba posterior también fue ilegal e irrazonable; pero ante todo, inadmisible por ser producto de un arresto ilegal. En suma, la defensa solicitó la supresión de los resultados de la prueba con el instrumento Alco-Sensor y los otros tantos de la prueba del Intoxilyzer 5000.

El Ministerio Público presentó un escrito para oponerse a la moción de supresión de evidencia. Argumentó que el uso del Alco-Sensor por parte del agente en la carretera es discrecional, que no es admisible en evidencia, y que de dicha prueba no se emite resultado en documento alguno. Alegó además que el resultado de la prueba de campo sólo abona a los signos de embriaguez que recopila el agente mediante sus sentidos y que conforman los motivos fundados para sospechar razonablemente que la persona detenida se encuentra bajo los efectos de bebidas embriagantes.

El Tribunal de Primera Instancia celebró una vista de supresión de evidencia. El Ministerio Público presentó el testimonio del agente Vélez Pabón. Finalizada ésta el foro primario determinó que no se cumplió con el mínimo de 20 minutos de observación, previos a la realización de la prueba de Alco-Sensor. Además, el tribunal expuso que el policía trasladó al cuartel al arrestado para efectuarle la prueba posterior con el Intoxilyzer 5000, debido a la

prueba preliminar del Alco-Sensor que él administró, cuyo resultado positivo le dio motivos fundados para ello. En consecuencia, el tribunal suprimió los resultados de las pruebas de Alco-Sensor, de Intoxilyzer "y todo lo posterior".[8]

Insatisfecho con la supresión automática de toda la evidencia científica, el Ministerio Público representado por la Oficina del Procurador General acudió ante el Tribunal de Apelaciones mediante un recurso de *certiorari*. Argumentó que el Tribunal de Primera Instancia no realizó un análisis particularizado de los hechos para dirimir los potenciales efectos adversos de no haber esperado 20 minutos para la prueba de Alco-Sensor, con el propósito de determinar si ello afectó el valor probatorio de la prueba realizada posteriormente con el Intoxilyzer 5000.

Luego de evaluar los planteamientos de las partes, el Tribunal de Apelaciones denegó expedir el recurso de *certiorari*. Entendió ese foro que como el agente no cumplió con el plazo reglamentario de observación de 20 minutos, la prueba de campo efectuada con el Alco-Sensor era inválida, lo cual, a su vez, también invalidaba el resultado de la prueba posterior del Intoxilyzer 5000.

Inconforme, el Estado acudió ante nos mediante un recurso de *certiorari* y una moción en auxilio de jurisdicción. En síntesis, alega que los foros *a quo* aplicaron una norma de exclusión absoluta y suprimieron

---

[8]Minuta-Resolución del Tribunal de Primera Instancia de 13 de junio de 2011, Apéndice, pág. 60.

toda la evidencia científica sin hacer un análisis particularizado de los hechos, según lo resuelto en Pueblo v. Montalvo Petrovich, 175 D.P.R. 932 (2009), para dirimir los efectos adversos que tuvo el incumplimiento con el periodo de observación de 20 minutos previo a efectuar la prueba con el Alco-Sensor. Ello, con el propósito de determinar si se vio afectado el valor probatorio de la prueba posterior, realizada con el Intoxilyzer 5000.

Examinado el recurso, expedimos el auto solicitado y ordenamos la paralización de los procedimientos en el Tribunal de Primera Instancia. Con el beneficio de la comparecencia de las partes, procedemos a resolver.

II

Nuestra Constitución prohíbe que de ordinario un funcionario del orden público arreste a alguna persona sin previa orden judicial fundada en una determinación de causa probable. Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1; Pueblo v. Martínez Torres, 120 D.P.R. 496, 500 (1988). Este requerimiento constitucional no es absoluto. Un agente del orden público puede realizar un arresto sin previa orden judicial cuando: (1) se ha cometido un delito en su presencia; (2) se ha cometido un delito grave, sea o no en su presencia, y (3) cuando tuviese motivos fundados para creer que la persona ha cometido un delito grave. Regla 11 de las Reglas de Procedimiento Criminal, 34 L.P.R.A. Ap. II; Pueblo v. Serrano Reyes, 176 D.P.R. 437, 444 (2009).

Existen motivos fundados si de la totalidad de las circunstancias del caso se desprende que una persona ordinaria y prudente poseería aquella información y conocimiento que la llevarían a creer que la persona intervenida ha cometido un delito. Pueblo v. Calderón Díaz, 156 D.P.R. 549, 557 (2002); Pueblo v. Colón Bernier, 148 D.P.R. 135, 142 (1999); Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 770 (1991); Pueblo v. Martínez Torres, supra, pág. 504. Ello, indistintamente de que luego se pruebe o no la comisión de tal delito. Íd.

El concepto de motivos fundados es sinónimo del término causa probable empleado en el contexto de la expedición de una orden de arresto. Pueblo v. Calderón Díaz, supra, pág. 557; Pueblo v. Díaz Díaz, 106 D.P.R. 348, 353 (1977). La existencia de motivos fundados se determina a base de criterios de probabilidad y razonabilidad. Pueblo v. Ortiz Alvarado, 135 D.P.R. 41, 47 (1994). Lo verdaderamente importante es que el agente que efectúa un arresto y registro sin orden judicial previa tenga, al momento de hacerlo, base razonable que se desprenda de la totalidad de las circunstancias para creer que se está violando o se iba a violar la ley. Íd. Dicho de otra manera, para dirimir si un agente del orden público tenía motivos fundados para arrestar a un ciudadano sin orden, "es indispensable analizar la información que le constaba a éste y el cuadro fáctico que éste tenía ante sí al momento del arresto para, entonces, determinar si esos hechos pudieron llevar a una persona

prudente y razonable a creer que la persona que iba a ser arrestada había cometido, o iba a cometer, la ofensa en cuestión". Pueblo v. Calderón Díaz, *supra*, pág. 559.

No puede olvidarse que "[c]ada delito tiene unas características externas, una manera de realizarse, que lo proyectan visualmente, tipifican la circunstancia delictiva y dirigen el raciocinio hacia la concreción de motivos fundados para el arresto". Pueblo *ex rel*. E.P.P., 108 D.P.R. 99, 101 (1978). El agente del orden público debe relacionar el comportamiento de la persona que tiene ante sí con el conocimiento de los usos y costumbres de los infractores con los cuales el policía está familiarizado, máxime cuando se trata de delitos comunes de alta incidencia. Íd.

III

Conducir un vehículo en estado de embriaguez o bajo los efectos de sustancias controladas representa un peligro para nuestra sociedad. Con ello en mente, la Asamblea Legislativa aprobó la Ley Núm. 132-2004, la cual introdujo varias enmiendas a la Ley Núm. 22-2000, conocida como la Ley de Vehículos y Tránsito, 9 L.P.R.A. sec. 5001 *et seq.*; Pueblo v. Figueroa Pomales, 172 D.P.R. 403, 420 (2007). De esa manera, la Asamblea Legislativa reafirmó la política pública a favor de la seguridad pública y tuvo el firme propósito de evitar muertes en las carreteras, ocasionadas por conductores en estado de embriaguez. Íd.

En conformidad con la aludida política pública, y en lo pertinente, el Art. 7.09 de la Ley de Vehículos y

Tránsito (9 L.P.R.A. sec. 5209), dispone que "toda persona que transite por las vías públicas de Puerto Rico conduciendo un vehículo[…] habrá prestado su consentimiento [para] someterse a un análisis químico o físico de su sangre, o de su aliento,[…] así como una prueba inicial del aliento a ser practicada en el lugar de la detención". Un agente del orden público tiene autoridad para detener algún vehículo que transite por la vía pública si tiene motivos fundados para creer que el conductor ha cometido alguna violación a la ley. Art. 10.22 de la Ley de Vehículos y Tránsito (9 L.P.R.A. sec. 5302). Luego de que el agente informe el motivo de la detención y las violaciones aparentemente incurridas, el conductor deberá mostrarle todos los documentos que debe llevar consigo o en el vehículo, según lo dispuesto en ley. Íd.

El Art. 7.02 de la Ley de Vehículos y Tránsito (9 L.P.R.A. sec. 5202) "incorporó el lenguaje de 'ilegal *per se*' para establecer concretamente la ilegalidad del acto de conducir un vehículo de motor cuando el contenido de alcohol en la sangre del conductor es de 0.08% o más, según surja tal nivel o concentración del análisis químico o físico de su sangre, o de su aliento". Pueblo v. Montalvo Petrovich, *supra*, pág. 944. De esa forma, el nivel de alcohol en la sangre no es sólo un elemento probatorio, sino que es causa suficiente para concluir que la persona se encuentra bajo los efectos de bebidas embriagantes, en violación a la Ley de Vehículos y

Tránsito. Íd.; <u>Pueblo v. Figueroa Pomales</u>, *supra*. Véase además <u>Pueblo v. Tribunal Superior</u>, 84 D.P.R. 392 (1962).

En atención a lo antes expuesto, y en conformidad con el Art. 7.09(g) de la Ley de Vehículos y Tránsito, 9 L.P.R.A. sec. 5209(g), el Departamento de Salud creó el Reglamento Núm. 6346 de 14 de septiembre de 2001, con el objetivo de regular la toma de pruebas científicas para determinar la concentración de alcohol y otras sustancias en la sangre.[9] Este reglamento fue posteriormente sustituido por el Reglamento Núm. 7318 de 28 de febrero de 2007, el cual conserva similar propósito.[10]

En lo pertinente al caso de autos, el Reglamento Núm. 7318, *supra*, dispone que "antes de realizar una prueba con el Intoxilyzer, la persona intervenida se mantendrá bajo observación por un período mínimo de veinte (20) minutos, contados a partir de la hora de la intervención, para asegurarse de que no existe alcohol residual en su boca al momento de efectuarse el análisis", que pueda afectar la corrección de la prueba. Art. 8.14 del Reglamento Núm. 7318, *supra*. El alcohol residual es definido por el propio

---

[9]El mencionado Art. 7.09(g) de la Ley de Vehículos y Tránsito, 9 L.P.R.A. sec. 5209(g), faculta al Departamento de Salud para adoptar y reglamentar el uso de instrumentos científicos para determinar la concentración de alcohol en la sangre de los conductores detenidos por conducir o hacer funcionar vehículos bajo los efectos de bebidas embriagantes, drogas o sustancias controladas. Tal facultad se extiende al instrumento a ser utilizado por el agente del orden público para hacer la prueba inicial de aliento.

[10]Este reglamento fue enmendado por el Reglamento Núm. 7805 de 26 de enero de 2010, también conocido como Reglamento del Secretario de Salud Núm. 139.

reglamento como la "[c]antidad de alcohol que permanece en la mucosa de la boca por algún tiempo después de haberse ingerido alcohol, bien se encuentre en forma líquida o en forma de vapor". Art. 4.03 del Reglamento Núm. 7318, *supra*. Durante los 20 minutos de observación el agente debe evitar que el individuo fume, ingiera alimentos o se provoque vómito. De ello ocurrir deberá esperarse 20 minutos adicionales. Art. 8.15 del Reglamento Núm. 7318, *supra*. Estas normas también son aplicables a las pruebas preliminares de aliento realizadas a través del Alco-Sensor. Art. 8.23 del Reglamento Núm. 7318, *supra*.

En estrecha sintonía con la presente causa, en Pueblo v. Montalvo Petrovich, *supra*, dos agentes del orden público llegaron a una escena luego de ser alertados de la existencia de un accidente de tránsito en el cual una persona quedó gravemente herida y otras dos perdieron la vida. El conductor que alegadamente provocó el accidente, Sr. Gary Montalvo Petrovich, se encontraba fuera de su vehículo. Los policías se acercaron a él y le preguntaron si era el conductor del automóvil. El cuestionado respondió afirmativamente. Se le pidió que mostrara su licencia de conducir y la licencia del vehículo; y así lo hizo. El conductor caminaba y se expresaba de forma adecuada, y fue cooperador en todo momento. Justo cuando éste entregó los documentos solicitados, un policía alegó percibir olor a alcohol. Sin dilación, los agentes le preguntaron qué había sucedido. El conductor manifestó voluntariamente que estaba en una fiesta y que había

consumido varias copas de vino. Sin haberle practicado la prueba de Alco-Sensor, fue puesto bajo arresto y trasladado al cuartel. Allí, un agente le realizó la prueba de aliento con el instrumento Intoxilyzer 5000, la cual arrojó un resultado de .08 por ciento de alcohol, máximo permitido por ley. No transcurrieron más de 15 minutos desde que los agentes intervinieron en la carretera con el conductor hasta que se le realizó la prueba de aliento en el cuartel.

Presentadas las denuncias, decretada la causa probable para arresto y para acusación, la defensa solicitó la supresión de la evidencia científica. No cuestionó los motivos fundados de los agentes para trasladar al conductor al cuartel y allí efectuarle la prueba con el Intoxilyzer 5000. Tampoco cuestionó que no se le hubiera practicado al entonces detenido la prueba de aliento en la carretera con el Alco-Sensor. Pero sí disputó el incumplimiento con el periodo reglamentario de observación de 20 minutos antes de la prueba definitiva de aliento, razón por la cual solicitó se suprimiera automáticamente el resultado de ésta por falta de confiabilidad.

Con ese cuadro fáctico, por voz del Juez Presidente señor Hernández Denton, en Pueblo v. Montalvo Petrovich, *supra*, **rechazamos establecer una regla de exclusión automática ante cualquier incumplimiento con el procedimiento dispuesto por la regulación de pruebas de aliento.** Resolvimos claramente que el "tribunal debe

determinar —caso a caso— la magnitud de la desviación y el impacto que ésta puede tener sobre la confiabilidad y precisión de la evidencia". Íd., pág. 959. Si el "incumplimiento es de tal magnitud que a juicio del juzgador la prueba ya no es confiable, es deber del tribunal rechazarla". Íd. (Énfasis suprimido.) Lo importante en ese caso es la confiabilidad de la prueba, porque, a fin de cuentas, lo que se persigue encontrar es la verdad. Además, en esa ocasión concluimos que el Estado debe probar que cumplió sustancialmente con el periodo de observación de 20 minutos antes de tomar la prueba de aliento, "contados a partir del momento en que los agentes intervinieron con el acusado y estaban en posición de observarlo para poder determinar si éste ingirió alimentos, fumó o se provocó el vómito". Íd., pág. 959.

Como en ese caso el Estado no probó haber cumplido sustancialmente con el periodo de observación, circunstancia que crea serias dudas sobre la confiabilidad de la prueba de aliento y afecta significativamente su valor probatorio, resolvimos que la evidencia científica en cuestión era inadmisible en evidencia. No obstante lo anterior, expresamos claramente que "nada impide que el Estado presente otra evidencia para intentar probar que el [imputado] se encontraba bajo los efectos de bebidas embriagantes".[11] Íd., pág. 961. Para ese propósito se debe

_____

[11]En el pasado hemos resuelto que no es indispensable el resultado de una prueba química para probar que una persona conduce bajo los efectos de bebidas embriagantes. Véanse: Pueblo v. Zalduondo Fontánez, 89 D.P.R. 64, 71-72

evaluar, por ejemplo, "el dominio que éste tenía sobre sí mismo, la apariencia de sus ojos, el dominio del habla, el grado de control que ejerció sobre su vehículo hasta el momento del accidente, su estado anímico, así como cualquier otro factor que refleje el estado de sus facultades físicas y mentales". Íd.

IV

En el caso ante nos, la defensa del señor Caraballo Borrero alega que debe suprimirse el resultado de la prueba de aliento administrada con el Alco-Sensor porque el agente Vélez Pabón no cumplió con el periodo de observación de 20 minutos, dispuesto en el Reglamento Núm. 7318 del Departamento de Salud, *supra*.

Según mencionado, el referido periodo de observación de 20 minutos tiene el propósito de garantizar un mínimo de precisión y confiabilidad de la prueba que se administra. El incumplimiento con ese tiempo de observación crea serias dudas sobre la confiabilidad de la prueba de aliento y mina su valor probatorio. El agente del orden público debe cumplir con ese lapso de observación para asegurarse de que no queden restos de alcohol en la boca del sospechoso que puedan afectar la corrección de la prueba. Para ese fin también debe prestar particular atención a que el sospechoso no ingiera alimentos, fume o vomite durante el referido espacio

---

(1963); <u>Pueblo v. Tribunal Superior</u>, 84 D.P.R. 392, 400 (1962); <u>Pueblo v. Cabrera Osorio</u>, 84 D.P.R. 97, 99 (1961) (*Per Curiam*).

temporal. Estos requerimientos son elementales y lo único que exigen es un mínimo de diligencia.

En el caso de autos el agente Vélez Pabón administró la prueba con el Alco-Sensor a sólo 5 minutos de la intervención con el conductor. En tan escaso periodo de tiempo no hay certeza de que en la mucosa de la boca de éste no habiten rastros de alcohol, en forma líquida o en forma de vapor, que provoquen resultados científicamente no confiables. Ya en Pueblo v. Montalvo Petrovich, *supra*, resolvimos que el Estado no probó haber cumplido sustancialmente con el periodo de observación, ante una prueba de aliento administrada a la altura de 15 minutos desde la intervención con el sospechoso. En el caso de autos el Estado tampoco demostró haber cumplido con el periodo de observación requerido para administrar la prueba preliminar de aliento con el Alco-Sensor. Por lo tanto, el Tribunal de Primera Instancia actuó correctamente al decretar la supresión de esa evidencia, cuyo resultado carece de confiabilidad científica.

De otra parte, la defensa aduce que debe suprimirse también el resultado positivo de la prueba final de aliento efectuada con el Intoxilyzer 5000. Ello, pues entiende que el agente Vélez Pabón derivó los motivos fundados para creer que el detenido se encontraba bajo los efectos de bebidas embriagantes, de la inadmisible prueba de campo con el Alco-Sensor. Por ello, arguye que el arresto fue ilegal y que la prueba definitiva con el Intoxilyzer 5000 debe ser suprimida, de acuerdo a la

doctrina de los frutos del árbol ponzoñoso. Por su parte, el Estado alega que antes de efectuar la prueba con el Alco-Sensor el agente Vélez Pabón ya tenía motivos fundados para creer que el señor Caraballo Borrero se encontraba en estado de embriaguez, razón por la cual el arresto fue legal y la prueba posterior con el Intoxilyzer 5000 —que arrojó .175% de alcohol en la sangre y que fue administrada luego de 35 minutos de observación— no debe ser suprimida.

De entrada, no hay controversia respecto a que el agente Vélez Pabón detuvo al señor Caraballo Borrero por éste conducir un vehículo de motor a 85 millas por hora en una zona de 55 millas por hora. Ninguna parte disputa los motivos fundados de esa intervención inicial, ni el boleto expedido por conducir por encima del límite. La controversia se circunscribe en determinar si el agente tenía motivos fundados para arrestar al individuo antes de efectuarle la prueba de aliento con el Alco-Sensor.

En este punto debe quedar claro que por medio de las observaciones del comportamiento del conductor o de los signos externos de embriaguez, un agente del orden público puede derivar los motivos fundados para intervenir con éste y requerirle que se realice una prueba de aliento con el Alco-Sensor o con el Intoxilyzer 5000. Incluso, ya en el pasado hemos sostenido convicciones por conducir un vehículo de motor en estado de embriaguez, por medio de tales observaciones. "No debe olvidarse que la comisión

[de ese] delito puede establecerse por prueba independiente del resultado de los análisis". Pueblo v. Zalduondo Fontánez, 89 D.P.R. 64, 71-72 (1963); Pueblo v. Cruz Rivera, 88 D.P.R. 332, 335 (1963); Pueblo v. De Jesús Marrero, 88 D.P.R. 154 (1963). Si la conducta y los signos de embriaguez desplegados por el detenido pueden ser suficientes para sostener una convicción —asunto cuya naturaleza entraña mayores exigencias y rigores—, más aún pueden serlo para imprimirle motivos fundados al agente para requerirle al conductor que se efectúe una prueba de aliento en el cuartel.

En el caso ante nos, el agente Vélez Pabón caminó hasta el recién detenido deportivo blanco y le pidió al conductor la licencia de conducir y los documentos del vehículo. Justo cuando el señor Caraballo Borrero bajó la ventanilla de su vehículo para hacer entrega de éstos, el agente Vélez Pabón percibió un fuerte olor a alcohol. Ello provocó en el policía suficiente inquietud como para inquirir sobre la causa del hedor etílico. A un tiempo, el conductor intentó enunciar palabras para darse a entender y el agente notó el habla pesada de su interlocutor, quien aceptó haberse dado unos tragos.

Ante el fuerte olor a alcohol, el habla pesada de quien intenta articular palabras, y la admisión inequívoca del conductor de que se había dado unos tragos, cualquier persona prudente y razonable puede tener una **base razonable para creer** que el conductor intervenido conducía

un vehículo de motor en probable estado de embriaguez. Precisamente, estas circunstancias fueron las que crearon una sospecha individualizada y justificaron que el agente administrara la prueba de campo con el Alco-Sensor. Al analizar la información que le constaba al agente y el cuadro fáctico que éste tenía ante sí, resolvemos que esos hechos constituyen un mínimo de información necesaria para creer razonablemente que se ha violado la ley. Véase, Pueblo v. Calderón Díaz, *supra*, pág. 559. Además, concluimos que para efectos de determinar si un agente del orden público tiene motivos fundados para la intervención aquí en controversia, cualquier insuficiencia que pueda tener la descripción del estado de embriaguez ofrecida por dicho agente queda fortalecida por la admisión voluntaria del conductor a los efectos de que había ingerido bebidas alcohólicas. Véase, Pueblo v. Echevarría, 87 D.P.R. 208, 214-215 (1963).

Por lo tanto, aunque el Tribunal de Primera Instancia actuó correctamente al suprimir los resultados de la prueba con el Alco-Sensor, dicho foro erró al concluir que ello anulaba los motivos fundados del agente para arrestar al conductor. De hecho, en este caso la intervención en cuestión no sería legítima si antes de realizar la referida prueba de aliento el agente no tuviese motivos fundados para detener el vehículo y creer que el individuo se encontraba bajo los efectos de bebidas embriagantes. En las circunstancias particulares del caso ante nos, los resultados de la prueba con el Alco-Sensor sólo abonaron a

los signos de embriaguez que percibió el agente mediante sus sentidos y a la inequívoca admisión del conductor a los efectos de que había ingerido bebidas alcohólicas.

Aclarado el hecho de la existencia de los motivos fundados previo al resultado de la prueba con el Alco-Sensor, el arresto y traslado del señor Caraballo Borrero al cuartel para efectuarle una prueba definitiva de aliento con el Intoxilyzer 5000 fue legal y razonable. Por tanto, no procede la contención de la defensa respecto a la aplicación de la doctrina de los frutos del árbol ponzoñoso. La inadmisibilidad en evidencia de los resultados del examen administrado con el Alco-Sensor, en este caso, no incide con la legalidad de la intervención ni con la admisibilidad de la prueba con el Intoxilyzer 5000, la cual cumplió con todos los parámetros reglamentarios. Esto es: hubo un periodo de observación de 35 minutos —mayor al tiempo requerido para garantizar un mínimo de precisión y confiabilidad en la prueba— en el cual el agente se aseguró de que el señor Caraballo Borrero no fumara, comiera o vomitara; además, la prueba arrojó un resultado de .175% de alcohol en la sangre.[12] En cuanto a esta segunda prueba, colegimos que hubo un cumplimiento sustancial con los procedimientos y

_____

[12] No está en controversia que la persona que administró la mencionada prueba estaba cualificada y certificada por el Departamento de Salud, y que tal certificación se encontraba vigente al momento de administrar la prueba. Tampoco está en controversia el funcionamiento apropiado del instrumento y que éste fue aprobado por el Departamento de Salud, y certificado y calibrado en conformidad con la regulación aplicable.

estándares reglamentarios y operacionales para pruebas de aliento, lo cual imprime confiabilidad en el resultado.

V

Por los fundamentos antes expuestos, revocamos la resolución recurrida y devolvemos el caso al Tribunal de Primera Instancia para que continúen los procedimientos de forma cónsona con lo aquí resuelto.

Se dictará sentencia de conformidad.


                                        Luis F. Estrella Martínez
                                             Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Peticionario

        v.                     CC-2011-1064    Certiorari

Héctor Caraballo Borrero

    Recurrido


SENTENCIA


San Juan, Puerto Rico, a 8 de noviembre de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revoca la resolución recurrida y devolvemos el caso al Tribunal de Primera Instancia para que continúen los procedimientos de forma cónsona con lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo, Interina.


Larissa Ortiz Modestti
Secretaria del Tribunal Supremo, Interina