EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Jorge E. Martínez Landrón<br><br>Recurrido | Certiorari<br><br>2019 TSPR 86<br><br>202 DPR ____ |

Número del Caso: CC-2017-388

Fecha: 6 de mayo de 2019

Tribunal de Apelaciones:

    Región Judicial de San Juan – Caguas, Panel IV

Oficina del Procurador General:

    Lcdo. Luis Román Negrón
    Procurador General

    Lcda. Lisa Mónica Durán
    Procuradora General Auxiliar

Abogados de los recurridos:

    Lcdo. José R. Olmo Rodríguez

Materia: Derecho Penal - Periodo de observación de la persona intervenida antes de realizar una prueba de aliento opera a favor del acusado.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

        v.                  CC-2017-388     Certiorari

Jorge E. Martínez Landrón

    Recurrido

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 6 de mayo de 2019.

La controversia ante nuestra consideración se circunscribe a determinar a favor de quién opera -entiéndase a favor del Estado o del acusado- el período de 20 minutos de observación de la persona intervenida antes de realizar una prueba de aliento al amparo del Reglamento Núm. 7318[1] promulgado en

_____

[1] Reglamento para regular los métodos y procedimientos para la toma y análisis de muestras de sangre, orina o de cualquier otra sustancia del cuerpo y para adoptar y regular el uso de los instrumentos científicos para la determinación de concentración de alcohol, incluyendo la prueba inicial de aliento y la detección e identificación de drogas y/o sustancias controladas (Reglamento del Secretario de Salud Núm. 123 del Departamento de Salud), Reglamento Núm. 7318, Departamento de Estado, 9 de marzo de 2007 (Reglamento Núm. 7318).

virtud de la autoridad otorgada por la Ley de Vehículos y Tránsito de Puerto Rico, *infra*. Por entender que ese período opera a favor del acusado, **revocamos** el dictamen recurrido.

I

El 24 de abril de 2015, a eso de las 7:45 de la noche, el Sr. Jorge E. Martínez Landrón (señor Martínez Landrón) fue detenido en el Puente Teodoro Moscoso por el agente Osvaldo L. Merced López (agente Merced López) por manejar un vehículo de motor[2] a exceso de velocidad y transitar entre carriles de manera indebida.[3] Además de que la Policía de Puerto Rico (Policía) expidiera boletos de tránsito por cambio indebido de carriles y manejo a exceso de velocidad, el 19 de mayo de 2015 el Ministerio Público presentó una denuncia contra el señor Martínez Landrón por manejar un vehículo de motor bajo los efectos de bebidas embriagantes en violación al Art. 7.02 de la Ley Núm. 22-2000 conocida

---

[2] Un modelo Maserati GranTurismo.

[3] El agente Osvaldo L. Merced López (agente Merced López) declaró lo siguiente en el juicio:

"[…] En este caso **me percato de que viene un vehículo, un Maserati [GranTurismo] color blanco por el carril derecho, el radar me marca 71 millas por hora en una zona que está rotulada en 55.** El letrero más cercano está entrando al Puente Teodoro Moscoso. Cuando uno sale de la Carr. 26 o viene del aeropuerto como tal, entrando. Una vez le computo la velocidad a ese vehículo, de modo estacionario de la parte posterior, tanto lo identifico también por medio visual porque ya el vehículo una vez pasa por el lado de la patrulla el mismo mantiene la velocidad constante en el mismo carril **donde más luego que yo arranco veo que el vehículo se mueve hacia el carril izquierdo de extrema izquierda y vuelve a seguir transitando entre el carril de la extrema derecha y vuelve y se cambia nuevamente y hace dos cambios de carril consecutivamente. Más adelante, yo lo detengo después del peaje"**.

Véase *Transcripción de la prueba oral*, Apéndice de la Petición de *certiorari*, pág. 10.

como la Ley de Vehículos y Tránsito de Puerto Rico (Ley 22), según enmendada, 9 LPRA sec. 5202.

En el juicio celebrado el 18 de marzo de 2016, el agente Merced López testificó que al momento de la detención se percató que el señor Martínez Landrón expelía un fuerte olor a alcohol y tenía los ojos rojos.[4] Luego de esto, el agente intentó realizarle una prueba de aliento, pero el señor Martínez Landrón se negó. Ante la denegatoria, el agente Merced López le hizo las advertencias de ley para casos de embriaguez, y entonces lo arrestó y trasladó a la División de Patrullas de Carreteras de San Juan (cuartel).[5]

---

[4] Sobre el particular, el agente Merced López testificó lo siguiente en el juicio:

> "Antes de la salida lo detengo. Me voy por el lado del conductor, me presento como agente de orden público, le digo a la división a la que yo pertenezco, le indico mi número de placa, le indico el motivo de la intervención por lo cual se le está interviniendo al caballero que era por exceso de velocidad, se le indica también de donde se encontraba el rótulo más cercano, se le dice que está en todo su derecho de bajarse del vehículo y ver la velocidad computada en el radar de la patrulla y yo tener que explicarle de qué manera fue que se computó la velocidad. Sigo hablando con el caballero corroboro siempre las identificaciones, una vez que se le pide licencia, registro del vehículo, se verifican los datos para saber si yo estoy interviniendo con la persona correcta. **Me percato que la persona es un conductor que está bajo los efectos de bebidas embriagantes, ya que él mismo cuando me está dialogando me está [expeliendo] un fuerte olor a licor en el área. También tiene los ojos rojos.** Le digo al caballero al [haber] visto ese tipo de características, que se baje del vehículo que pase a la parte posterior, ya que él me había indicado dentro del vehículo también, de que una vez le dije que se podía bajar y ver la velocidad, él me dijo que no tenía prisa que iba a una actividad de su hija, que por eso es que estaba de prisa". (Énfasis suplido).

Véase *Transcripción de la prueba oral*, Apéndice de la Petición de *certiorari*, pág. 10.

[5] Durante el juicio en su fondo, el agente Merced López declaró lo siguiente a preguntas del Ministerio Público:

> "Fiscal: Y en ese espacio de tiempo desde que están en la patrulla y llegan a la División, usted lo perdió en algún momento de vista al Señor acusado?
> Agente: En ningún momento lo perdí".

Véase *Transcripción de la prueba oral*, Apéndice de la Petición de *certiorari*, pág. 18.

Según el testimonio del agente Merced López, llegaron al cuartel a las 8:10 de la noche y desde ese momento el señor Martínez Landrón estuvo bajo observación del agente Merced López para que éste no comiera, fumara o se provocara el vómito.[6] De igual manera, señaló que durante ese tiempo esperaban la llegada del abogado del señor Martínez Landrón. El agente Merced López también testificó que el período de observación comenzó a las 8:35 de la noche y finalizó a las 8:56 de la noche. Sobre esto, el agente Merced López también declaró lo siguiente:

> "Fiscal: ¿A qué hora surge del documento que usted llegó?
> Agente: A las 8:10.
> Fiscal: **¿Y a qué hora empezó a hacer la observación?**
> Agente: **Se empieza a hacer la observación desde las 8:35 hasta las 8:56.**
> Fiscal: Una pregunta, una vez, **usted dice, que una vez llega est[á] en la patrulla hasta que llega a tr[á]nsito no lo perdió de vista, una vez llega a tr[á]nsito a las 8:10, a las 8:35, usted lo perdió de vista al Señor acusado en algún momento**?
> Agente: **No, en ningún momento.**
> Fiscal: Y a las 8:35, qué fue lo que ocurrió?
> Agente: A las 8:35 el caballero se sient[a]… estaba al lado mío todavía, pero como él, anteriormente a que se se le hiciera la prueba, él tenía que hablar con su abogado, el cual cuando el Licenciado llega a la División de Patrullas de Carreteras de San Juan, ahí yo me doy cuenta qui[é]n es el abogado, y ahí yo le indico lo que estaba pasando. Sí le di una oportunidad de que él hablara.
> Fiscal: ¿Y usted lo perdió de vista cuando hablaba?
> Agente: En ningún momento, en ningún momento […]
>     .    .    .    .    .    .    .    .
> Fiscal: ¿A qué hora se le hizo la prueba?

---

[6] En relación con lo que ocurrió una vez llegaron al cuartel, el agente Merced López testificó esto:
> "Fiscal: ¿Y qué pasó una vez llegan al cuartel, a la División?
> Agente: **Cuando llegamos al cuartel llegamos aproximadamente era[n] las 8:10 de la noche, llegamos al cuartel, donde se le indicó al caballero nuevamente todo el procedimiento que se iba a hacer[,]** ya que el caballero se estaba negando a hacer cualquier tipo de prueba, hasta que llegara su abogado. […] yo empecé a otorgárselo [el tiempo de observación] en el Cuartel, aunque sé que lo tenía en observación desde que empieza la intervención hasta que llegamos a la División todavía estaba bajo observación, pero las anotaciones en mis documentos yo se las coloqué dándoselo en el Cuartel para que estuviera bien seguro estando al lado mío en el cuarto donde está la máquina de intoxylizer (sic)". (Énfasis suplido).

Véase *Transcripción de la prueba oral*, Apéndice de la Petición de *certiorari*, pág. 18.

Agente: La hoja… los 20 minutos se terminaron a las 8:56. A las 8:57 empieza el comienzo de prueba, y se empieza… la máquina ponchó sus resultados a las y 21, que es la del ponche.
Juez: ¿A las y 21 de? ¿A las 9:21?
Agente: A las 9, sí.
Juez: ¿9:21?
Agente: Y veinte. No, no, no, a las nueve.  A las 8:57
Juez: Comenzó
Agente: Es que yo activo la máquina para entrar la…
Juez: Correcto
Agente: Entonces a las 8.55 es que se termina el tiempo de observación de los veinte minutos.  A las y veintiuno, que en ese caso sería las 9:00.
Fiscal: Esa es la hora militar.
Agente: Sería las 9:00, entonces es que ahí la máquina poncha el resultado.
Fiscal: ¿Y cuál fue el resultado?
Agente: Dando .123% de alcohol en el organismo".  (Énfasis suplido).[7]

Como vemos, el período de observación duró 21 minutos. Además, indicó que a las 8:57 de la noche inició la prueba de alcohol con la máquina *Intoxilyzer 5000*.  Esta prueba culminó a las 9:00 de la noche y arrojó un resultado de 0.123% de alcohol en el organismo.

Durante el contrainterrogatorio al agente Merced López en juicio, la Defensa le preguntó sobre un alegado apagón de luz que hubo en el cuartel al momento de realizar la prueba de aliento.  Sobre esto, el agente Merced López indicó que ese apagón surgió antes de que se realizara la prueba.[8]

El tribunal de instancia encontró culpable al señor Martínez Landrón por violación al Art. 7.02 de la Ley 22, *supra*, y lo condenó a las siguientes penas: multa de $400, multa de $200 conforme a la Ley Núm. 144-2014 y pago de $100 por la pena especial de la Ley Núm. 183-2012.  Además, se

---

[7] Véase *Transcripción de la prueba oral*, Apéndice de la Petición de *certiorari*, págs. 19-20.

[8] Véase *Transcripción de la prueba oral*, Apéndice de la Petición de *certiorari*, pág. 30.

refirió al curso de Mejoramiento para Conductores del Departamento de Transportación y Obras Públicas, se le impuso 15 días de reclusión "suspendido condicionado a finalizar el curso" y se le suspendió la licencia de conducir por 30 días.[9]

Inconforme con el fallo condenatorio, el señor Martínez Landrón acudió ante el Tribunal de Apelaciones mediante un recurso de Apelación Criminal. Señaló como único error que el tribunal de instancia lo encontrara culpable "cuando el agente no lo tuvo bajo observación durante los 20 minutos reglamentarios, pues durante el período de observación hubo un apagón que ocasionó que se fuera la luz en el cuartel por varios minutos".[10]

Posteriormente, el Estado solicitó en su Alegato que el Tribunal de Apelaciones confirmara "en toda su extensión la condena y la sentencia apeladas porque se imputó y probó más allá de duda razonable que el apelante ilegalmente estuvo conduciendo en estado de ebriedad".[11] Añadió que "[l]a prueba de aliento cumplió con los requisitos reglamentarios, sin que el supuesto apagón ocurrido mucho antes de administrar la prueba haya arrojado siquiera remotamente dudas sobre su confiabilidad o precisión".[12]

Más adelante, el Tribunal de Apelaciones revocó al foro de instancia al entender que no se cumplió con el

---

[9] *Sentencia*, Apéndice de la Petición de *certiorari*, pág. 63.

[10] *Apelación Criminal*, Apéndice de la Petición de *certiorari*, pág. 44.

[11] *Alegato del Pueblo*, Apéndice de la Petición de *certiorari*, pág. 83.

[12] Íd.

requisito reglamentario de observar al acusado por 20 minutos antes de administrar la prueba de aliento. En particular, determinó que existía duda razonable sobre la confiabilidad, el valor probatorio y, por lo tanto, la admisibilidad de la prueba de aliento, debido a que no surgía de la transcripción que el agente Merced López hubiese mantenido al señor Martínez Landrón en observación durante el apagón en el cuartel.[13] También concluyó que la alegación de que el señor Martínez Landrón tenía los ojos rojos y expelía olor a alcohol, por sí sola, no es suficiente para establecer, más allá de duda razonable, que el señor Martínez Landrón conducía con un por ciento de alcohol en su sangre en exceso de lo permitido por ley.[14]

Inconforme con la decisión del foro apelativo intermedio, el Estado solicitó reconsideración, pero ésta fue denegada. Insatisfecho con tal determinación, el Estado presentó ante esta Curia el recurso que nos ocupa, en el que señala estos dos errores:

> Erró el Honorable Tribunal de Apelaciones al atender el señalamiento de que el apagón produjo una deficiencia en el requisito de observación previo de 20 minutos en la toma de aliento al Sr. Jorge E. Martínez Landrón porque ese error no fue anunciado en la *Apelación Criminal* instada el 19 de mayo de 2016.

> Erró el Honorable Tribunal de Apelaciones al revocar sobre la base de una duda especulativa (apagón) y estimar que tal circunstancia externa vició automáticamente la observación que del intervenido tuvo el agente por más de 40 minutos. Más aún si había prueba independiente de la embriaguez de Martínez Landrón, quien conducía a exceso de

---

[13] *Sentencia*, Apéndice de la Petición de *certiorari*, pág. 95.

[14] Íd.

> velocidad, cambiaba erráticamente de carriles, tenía los ojos rojos y expelía un fuerte olor a alcohol. (Énfasis en el original).

Expedimos el auto de *certiorari* y, conforme solicitado por el Estado, acogimos la Petición de *certiorari* como el Alegato de la parte peticionaria acorde con la Regla 33 (k) de nuestro Reglamento[15] y recibimos el Alegato del recurrido. En vista de ello, estamos en posición de adjudicar la controversia en sus méritos. Pasemos entonces a exponer el marco jurídico aplicable.

## II

El acto de conducir un vehículo de motor en estado de embriaguez o bajo los efectos de sustancias controladas constituye un grave peligro para nuestra sociedad, pues atenta contra el bienestar de los ciudadanos en las carreteras del País.[16] Ante una realidad alarmante en el aumento de las intervenciones por conducir en estado de embriaguez, la Legislatura procedió "a revisar las normas establecidas en la 'Ley de Vehículos y Tránsito de Puerto Rico' con respecto al consumo de alcohol en nuestras carreteras, el proceso de identificar a los que conducen vehículos de motor bajo los efectos de bebidas alcohólicas y sustancias controladas, además de las multas y penalidades por este tipo de violación, entre otros fines".[17] Así, con

---

[15] 4 LPRA Ap. XXI-B, R. 33 (k).

[16] Pueblo v. Caraballo Borrero, 187 DPR 265, 274 (2012); Pueblo v. Montalvo Petrovich, 175 DPR 932, 944 (2009); Pueblo v. Figueroa Pomales, 172 DPR 403, 419 (2007).

[17] Exposición de Motivos de la Ley Núm. 132-2004.

el objetivo de reafirmar la política pública a favor de la seguridad pública, la Asamblea Legislativa aprobó la Ley Núm. 132-2004 para incluir varias enmiendas a la Ley 22.

El Art. 7.02 (a) de la Ley 22, 9 LPRA sec. 5202, establece que "[e]s ilegal per se, que cualquier persona de veintiún (21) años de edad, o más, conduzca o haga funcionar un vehículo de motor, cuando su contenido de alcohol en su sangre sea de ocho centésimas del uno por ciento (0.08%) o más, según surja tal nivel o concentración del análisis químico o físico de su sangre o aliento". Además, el Art. 7.02 de la Ley 22, *supra*, indica que lo dispuesto en ese inciso (a) no debe interpretarse en el sentido de que ello "limita la presentación de cualquier otra evidencia competente sobre si el conductor estaba o no bajo los efectos de bebidas embriagantes al tiempo de cometerse la alegada infracción".

Por su parte, el Art. 7.09 de la Ley 22, 9 LPRA sec. 5209, establece que "toda persona que transite por las vías públicas de Puerto Rico conduciendo un vehículo […] habrá prestado su consentimiento a someterse a un análisis químico o físico de su sangre, o de su aliento […] así como una prueba inicial del aliento a ser practicada en el lugar de la detención por el agente del orden público o cualquier otro funcionario autorizado por ley". A su vez, el inciso (c) del propio Art. 7.09 de la Ley 22, *supra*, esboza que:

> [c]ualquier agente del orden público o funcionario debidamente autorizado por ley deberá requerir de

cualquier conductor que se someta a cualesquiera de dichos análisis químicos o físicos después de haberle detenido si tiene motivo fundado para creer que dicha persona conducía o hacía funcionar un vehículo bajo los efectos de bebidas embriagantes, drogas o sustancias controladas, o cuando habiendo sido detenido por razón de una posible infracción a la ley o a las leyes de servicio público y sus reglamentos, existieren motivos fundados para creer que conducía o hacía funcionar un vehículo bajo los efectos de bebidas embriagantes, drogas o sustancias controladas al tiempo de su detención.

Como vemos, el Art. 7.09 (c) de la Ley 22, *supra*, dispone que un agente del orden público tiene autoridad para detener a cualquier conductor que transite por la vía pública si tiene motivos fundados para creer que ese conductor ha cometido alguna violación a la ley.[18] Una vez el agente notifique sobre el motivo de la detención y las violaciones de ley aparentemente incurridas, el conductor vendrá obligado a identificarse y a mostrar todos los documentos que debe llevar consigo o en el vehículo, según requiere la ley.[19]

De conformidad con el Art. 7.09 (g) de la Ley 22, 9 LPRA sec. 5209, el Departamento de Salud promulgó el "Reglamento para regular los métodos y procedimientos para la toma y análisis de muestras de sangre, orina o de cualquier otra sustancia del cuerpo y para adoptar y regular el uso de los instrumentos científicos para la determinación de concentración de alcohol, incluyendo la prueba inicial de aliento y la detección e identificación de drogas y/o

---

[18] Véase, también, Art. 10.22 de la Ley de Vehículos y Tránsito de Puerto Rico (Ley 22), según enmendada, 9 LPRA sec. 5302, sobre la autoridad de los agentes del orden público.

[19] Véase Pueblo v. Caraballo Borrero, supra, págs. 274-275.

sustancias controladas" (Reglamento del Secretario de Salud Núm. 123 del Departamento de Salud), Reglamento Núm. 7318, Departamento de Estado, 9 de marzo de 2007 (Reglamento Núm. 7318).[20]

El Art. 4.03 del Reglamento Núm. 7318, *supra*, define "alcohol residual" como la "[c]antidad de alcohol que permanece en la mucosa de la boca por algún tiempo después de haberse ingerido alcohol, bien se encuentre en forma líquida o en forma de vapor". Asimismo, el Art. 4.04 define "alcoholímetro" como "[i]nstrumento científico para determinar el por ciento de alcohol en la sangre de una persona por medio del análisis de alcohol en el aliento". Entre éstos se incluyen el Intoxilyzer 5000 y el Intoxilyzer 5000 EN.

En lo pertinente al presente caso, el Art. 8.14 del Reglamento Núm. 7318, *supra*, dispone que **"[a]ntes de realizar una prueba con el *Intoxilyzer*, la persona intervenida se mantendrá bajo observación por un periodo mínimo de veinte (20) minutos, contados a partir de la hora de la intervención,** para asegurarse de que no existe alcohol residual en su boca al momento de efectuarse el análisis". (Énfasis suplido). Mientras, el Art. 8.15 del Reglamento Núm. 7318, *supra*, expresa que **durante ese período de 20 minutos la persona estará bajo observación y el agente**

---

[20] Este Reglamento fue enmendado por el Reglamento del Secretario de Salud Núm. 139 del Departamento de Salud, Reglamento Núm. 7805, Departamento de Estado, 26 de enero de 2010. Valga destacar que este Reglamento Núm. 7805 solo enmendó el Art. V, Secciones 5.03, 5.20, 5.21 y 5.22, y el Art. VIII, Secciones 8.08 y 8.23.

**debe evitar que dicha persona fume, ingiera alimentos o se provoque vómito.** En caso de que ocurra alguna de estas circunstancias, la persona deberá esperar 20 minutos adicionales a partir de la hora en que ocurrió el evento y así lo documentará el agente interventor y/o el operador del instrumento encargado de realizar la prueba de aliento. Claramente, el mencionado período de observación de 20 minutos tiene el objetivo de garantizar un mínimo de precisión y confiabilidad de la prueba que se administra.[21]

En _Pueblo v. Montalvo Petrovich_, 175 DPR 932 (2009), este Tribunal rechazó establecer una regla de exclusión automática ante un incumplimiento con el período de observación de la persona intervenida antes de realizar una prueba de aliento según lo dispone el Reglamento Núm. 7318. La controversia giraba en torno a si el incumplimiento con el requisito de 20 minutos de observación previo a realizar la prueba de aliento para determinar los niveles de alcohol en la sangre acarreaba la inadmisibilidad de dicha prueba. Resolvimos, pues, que el tribunal de instancia debía evaluar -caso a caso- el efecto del incumplimiento sobre la confiabilidad y precisión de la prueba conforme a los criterios de la Regla 19 de las Reglas de Evidencia (actual Regla 403),[22] para así determinar si se ha afectado su valor probatorio y, por lo tanto, si debe ser rechazada.[23]

---

[21] _Pueblo v. Caraballo Borrero_, supra, pág. 279.

[22] 32 LPRA Ap. IV. La equivalencia actual para la anterior Regla 19 es la Regla 403 de las Reglas de Evidencia de 2009, 32 LPRA Ap. VI.

[23] _Pueblo v. Montalvo Petrovich_, 175 DPR 932, 937 (2009).

Asimismo, en Pueblo v. Montalvo Petrovich, supra, aclaramos que el tiempo reglamentario para el periodo de observación antes de tomar la prueba de aliento debe contarse a partir del momento en que el agente interviene con el acusado y está en posición de observarlo para poder determinar si éste ingirió alimentos, fumó o se provocó el vómito.[24] Así pues, allí concluimos que el Estado no probó haber cumplido sustancialmente con el período de observación dispuesto por reglamento,[25] de forma tal que ello creó serias dudas respecto a la confiabilidad de la prueba de aliento y afectó de manera significativa su valor probatorio.[26] No obstante, en aquella ocasión enfatizamos que nada impide que el Estado presente otra evidencia para intentar probar que la persona se encontraba bajo los efectos de bebidas embriagantes cuando fue detenida.[27] Esto es, prueba independiente del resultado de los análisis de las muestras tomadas a la persona detenida.[28] Por lo tanto, el tribunal

---

[24] Íd., pág. 959.

[25] En aquel momento el reglamento vigente era el Reglamento para regular los métodos y procedimientos para la toma y análisis de muestras de sangre o de cualquier otra sustancia del cuerpo y para adoptar y regular el uso de los instrumentos científicos para la determinación de concentración de alcohol, drogas y/o sustancias controladas, incluyendo la prueba inicial del aliento (Reglamento del Secretario de Salud Núm. 110 del Departamento de Salud), Reglamento Núm. 6346, Departamento de Estado, 17 de septiembre de 2001.

[26] Pueblo v. Montalvo Petrovich, supra, pág. 961.

[27] Pueblo v. Montalvo Petrovich, supra, pág. 961. Véanse, además: Pueblo v. Zalduondo Fontánez, 89 DPR 64, 71-72 (1963); Pueblo v. Tribunal Superior, 84 DPR 392, 400 (1962); Pueblo v. Cabrera Osorio, 84 DPR 97, 99 (1961).

[28] Pueblo v. Zalduondo Fontánez, supra, págs. 71-72. Véase, además, Pueblo v. Díaz Just, 97 DPR 59, 63 (1969).

de instancia deberá evaluar el dominio que la persona tenía sobre sí misma, la apariencia de los ojos, el dominio del habla, el grado de control que ejerció sobre su vehículo hasta el momento del accidente, su estado de ánimo, así como cualquier otro factor que refleje el estado de sus facultades físicas o mentales.[29]

Según expresamos en Pueblo v. Caraballo Borrero, 187 DPR 265, 280-281 (2012), el comportamiento y los signos externos de embriaguez exhibidos por la persona detenida pueden ser suficientes para sostener una convicción por conducir un vehículo de motor en estado de embriaguez. Como mencionamos antes, esto puede establecerse mediante prueba independiente del resultado de los análisis.[30]

En relación al período de observación, también en Pueblo v. Caraballo Borrero, supra, pág. 279, expresamos que:

> el referido período de observación de 20 minutos tiene el propósito de garantizar un mínimo de precisión y confiabilidad de la prueba que se administra. El incumplimiento con ese tiempo de observación crea serias dudas sobre la confiabilidad de la prueba de aliento y mina su valor probatorio. El agente del orden público debe cumplir con ese lapso de observación para asegurarse de que no queden restos de alcohol en la boca del sospechoso que puedan afectar la corrección de la prueba. Para ese fin también debe prestar particular atención a que el sospechoso no ingiera alimentos, fume o vomite durante el referido periodo. Estos requerimientos son elementales y lo único que exigen es un mínimo de diligencia.

---

[29] Pueblo v. Montalvo Petrovich, supra, pág. 961. Véase, además, Pueblo v. Caraballo Borrero, supra, pág. 278.

[30] Pueblo v. Caraballo Borrero, supra, pág. 280. Véanse, además: Pueblo v. Cruz Rivera, 88 DPR 332, 335 (1963); Pueblo v. De Jesús Marrero, 88 DPR 154, 156 (1963).

                                    III

     Por los fundamentos que esbozaremos a continuación, solo atenderemos el segundo error señalado por el Estado. Éste dispone del recurso y concede la razón al Estado, por lo que huelga discutir el primer error expuesto por dicha parte.

     En síntesis, el Estado alega que el foro apelativo intermedio erró al estimar que el apagón que ocurrió en el cuartel vició automáticamente el período de observación de la persona detenida, a quien el agente Merced López observó por más de 40 minutos.

     En el caso de Pueblo v. Montalvo Petrovich, supra, establecimos que no todo incumplimiento acarrea la absolución del acusado.  Hoy añadimos que esa máxima es correcta, **más aún cuando la irregularidad en realidad beneficia al acusado.** Como mencionamos, el Reglamento Núm. 7318, supra, dispone que "la persona intervenida se mantendrá bajo observación por un período mínimo de veinte (20) minutos, contados a partir de la hora de la intervención, para asegurarse de que no existe alcohol residual en su boca al momento de efectuarse el análisis".[31]  En particular, podemos establecer que el periodo de 20 minutos de observación opera a favor del acusado, toda vez que el propósito del mismo es evitar que la prueba arroje un resultado falso o incorrecto.  Este propósito va estrictamente ligado al interés del Estado de ser justos con el ciudadano.  En este caso no vemos un nexo

---

[31] Art. 8.14 del Reglamento Núm. 7318, supra.

causal entre el breve apagón suscitado en el cuartel y la violación de un derecho del señor Martínez Landrón, toda vez que el período de observación no se acortó, sino todo lo contrario, se duplicó. Habida cuenta de que el período de 20 minutos de observación previo a la prueba de aliento obra a favor del acusado y el derecho a la observación obra a favor del Estado, el derecho del acusado no fue menoscabado.

En el caso ante nuestra consideración, entendemos que la intervención cumplió con todos los parámetros reglamentarios. En particular, el agente Merced López observó al señor Martínez Landrón por un periodo de alrededor de 40 minutos, **claramente un término mayor al requerido para garantizar un mínimo de precisión y confiabilidad en la prueba de aliento que se administró.** Dicho período comenzó a contar desde el momento en que el agente Merced López intervino con el señor Martínez Landrón. Además, resulta imperativo resaltar que aunque de la transcripción no se desprende específicamente en qué momento ocurrió el apagón de luz, por los comentarios de los abogados podemos inferir que éste ocurrió una vez había transcurrido el período de 20 minutos requeridos por reglamento. Esto refuerza aún más la confiabilidad de la observación realizada por el agente Merced López.

Así, conviene contextualizar la frase de un pionero de las ciencias forenses y la criminología, el doctor francés Edmond Locard, quien señaló que "el tiempo que pasa es la verdad que huye". En las circunstancias del caso ante

nuestra consideración, cada minuto adicional que se concede como parte del período de observación obra a favor del acusado y en contra del Estado, pues es claro que el porciento de alcohol residual disminuye. Por lo tanto, reiteramos que la alegada irregularidad en el caso de autos opera en contra del Estado. Además, si tomamos en consideración las declaraciones del agente Merced López sobre los ojos rojos y el fuerte olor a alcohol que expelía el señor Martínez Landrón, éstas claramente imprimieron una mayor confiabilidad hacia el resultado de la prueba administrada.

Por último, debemos puntualizar la norma reiterada por este Foro relativa a que "[l]as determinaciones del tribunal de origen no deben ser descartadas arbitrariamente ni sustituidas por el criterio del tribunal apelativo a menos que éstas carezcan de fundamento suficiente en la prueba presentada".[32] En la misma línea, hemos manifestado que la "'determinación de culpabilidad' que hace el juzgador de los hechos a nivel de instancia es merecedora de gran deferencia por parte del tribunal apelativo", ello porque se encuentra en mejor posición para evaluar la prueba desfilada.[33] Esto es, el foro de instancia tiene la oportunidad de ver y oír a los testigos declarar, ante lo cual su apreciación merece gran respeto y deferencia.[34] Por lo tanto, "[e]n ausencia de

---

[32] Pueblo v. Maisonave Rodríguez, 129 DPR 49, 62 (1991).

[33] Pueblo v. Cabán Torres, 117 DPR 645, 653-654 (1986).

[34] Pueblo v. Maisonave Rodríguez, supra, pág. 63; Pueblo v. Cabán Torres, supra, pág. 654.

pasión, prejuicio, parcialidad y error manifiesto, y a menos que la apreciación de la evidencia se aleje de la realidad fáctica o la prueba sea inherentemente imposible o increíble, el tribunal apelativo debe abstenerse de intervenir con la apreciación de la evidencia hecha por el foro recurrido".[35] Examinado el recurso ante nuestra consideración, no encontramos las circunstancias que justifiquen la sentencia revocatoria emitida por el Tribunal de Apelaciones.

IV

Por todo lo anterior, revocamos la decisión del Tribunal de Apelaciones y reinstalamos la determinación emitida por el tribunal de instancia.

Se dictará sentencia de conformidad.


                                    Erick V. Kolthoff Caraballo
                                         Juez Asociado

---

[35] Pueblo v. Maisonave Rodríguez, supra, pág. 63

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Peticionario

       v.                CC-2017-388      Certiorari

Jorge E. Martínez Landrón

    Recurrido


SENTENCIA


San Juan, Puerto Rico, a 6 de mayo de 2019.

      Por los fundamentos expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, revocamos la decisión del Tribunal de Apelaciones y reinstalamos la determinación emitida por el tribunal de instancia.

      Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Feliberti Cintrón no interviene.


                José Ignacio Campos Pérez
             Secretario del Tribunal Supremo